LOCAL 1316, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Plaintiff,

v.

SUPERIOR CONTRACTORS AND ASSOCIATES, INC., Defendant.

Civ. A. No. C84–309A.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 15, 1985.

James T. Langford, Jacobs and Langford, Atlanta, Ga., for plaintiff.

Ronald L. Mason, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for defendant.

## ORDER

MOYE, Chief Judge.

The above-captioned labor management relations action is before the Court on numerous motions: (1) the plaintiff's motion to dismiss and for summary judgment, (2) the defendant's Superior Contractors and Associates, Inc. (Superior), motion to amend its counterclaim, (3) the plaintiff's motion to amend its complaint, (4) the plaintiff's motion to compel discovery, and (5) Superior's motion to have its trial brief included in the pretrial order. The plaintiff invokes the jurisdiction of this Court pursuant to 29 U.S.C.A. § 185 (West 1978) and principles of pendent jurisdiction.

This action arises out of the Plant Scherer construction project, which Georgia Power Company began more than ten years ago. Representatives for Georgia Power Company and the plaintiff signed an agreement on September 25, 1974, designated the Plant Scherer Project Agreement (Scherer Agreement). The Scherer Agreement was to cover all construction work for the building of a four-unit, coal-fired electric generating plant. Georgia Power Company hired Superior as the general contractor for the project.

The plaintiff refers men to the job site through its hiring hall. This controversy began after Superior hired electricians who were travelers, i.e., members of other locals, or who were not members of any union at a time when the plaintiff was unable to refer sufficient personnel. Once on the job site, the nonunion personnel and travelers were victims of a harrassment campaign, which the plaintiff allegedly orchestrated.

In the first half of 1983, Superior suffered a slowdown in work and conducted a reduction in force. On May 9, 1983, the plaintiff filed a grievance concerning the way Superior conducted the layoff. The basis of the grievance was that Superior would not agree to lay off travelers and nonunion employees before union members. On October 4, 1983, the plaintiff requested arbitration of this grievance; when Superior declined, this lawsuit ensued. The essence of the plaintiff's complaint is that Superior has, by contract, agreed to adopt a different layoff procedure than that utilized. The plaintiff further contends that Superior agreed to arbitrate this sort of dispute. The plaintiff therefore seeks to compel arbitration. This contention is grounded on the Inside Working Agreement Between Local Union No. 1316, International Brotherhood of Electrical Workers (IBEW) and the Georgia Chapter of the National Electrical Contractors Association, Inc. (N.E.C.A. contract), which the plaintiff asserts is incorporated by reference in the collective bargaining agreement between Superior and the plaintiff, i.e., the Scherer Agreement.

Superior has filed a counterclaim, which the plaintiff initially moved to dismiss, alleging various claims under Georgia law. Prior to filing its counterclaim, Superior filed three charges with the National Labor Relations Board (NLRB) alleging that the plaintiff's activities were unfair labor practices within the meaning of section 8 of the National Labor Relations Act (NLRA or Act). Following the counterclaim, a fourth charge was filed. The first and second charges were filed in 1982 and generally allege that the plaintiff engaged in unfair labor practices within the meaning of section 8(b) of the NLRA. The third charge is dated March 12, 1984 and alleges that the plaintiff engaged in unfair labor practices within the meaning of section 8(b)(1)(A) and (2) of the NLRA by, among other things, "filing a lawsuit in Federal Court seeking to compel arbitration. In the arbitration,

the Union would seek to have Superior discharge all traveling employees in violation of their rights under the Act." Deposition of Ronald A. Lanier, Exhibit 11. To date, it appears that the NLRB considered only one of the charges valid, and it does not pertain directly to the subject matter of this lawsuit. The Regional Director's letter of April 6, 1984, to Superior included the following language: "The investigation [by the NLRB] ... disclosed insufficient evidence of unlawful motivation in the filing of the suit [by the plaintiff under section 301 of the Act to compel arbitration of its grievance]. Rather, there appeared to be arguable merit to the Union's claim that the local agreement provision regarding layoffs was applicable and therefore arbitrable." Deposition of Ronald A. Lanier, Exhibit 12. Upon motion for reconsideration, the Office of Appeals stated in its letter that it would not depart from its earlier decision. *Id.* Exhibit 16.

For the reasons set forth below, the Court grants the plaintiff's motion for summary judgment ordering arbitration and dismissing Superior's state law claims. Remaining for consideration then, is Superior's claim for violation of section 301 of the Act, stated in its amendment to its counterclaim.

## ARBITRABILITY

 The plaintiff asks this Court to establish that it has a legal right to arbitrate its grievance concerning the layoff procedure. The Court's function, in suits brought to compel arbitration under section 301 of the Act, is limited to a determination of whether the recalcitrant party agreed to arbitrate the grievance. *E.g., United Textile Workers, Local 120 v. Newberry Mills, Inc.,* 315 F.2d 217, 218 (4th Cir.), *cert. denied,* 375 U.S. 818, 84 S.Ct. 54, 11 L.Ed.2d 53 (1963). Superior contends that the Court's authority to review the contract entered into between the parties to determine whether a dispute is arbitrable is well established. While this may be the general rule, it is subject to exception:

The weight of authority supports the rule that a court should compel arbitration of the arbitrability issue where the collective bargaining agreement contains a standard arbitration clause, the parties have not clearly excluded the arbitrability issue from arbitration, and deciding the issue would entangle the court in interpretation of substantive provisions of the collective bargaining agreement and thereby involve consideration of the merits of the dispute.

*CWA v. Western Electric Co.,* 751 F.2d 203, 206 (7th Cir.1984).

The collective bargaining agreement at issue between the parties is the Scherer Agreement, which provides for a grievance and arbitration procedure as follows:

ARTICLE IX. *Grievance Procedure*

Any question arising out of, and during the term of, this Agreement involving its interpretation and application, other than general wage rates, ... shall be handled by the grievance and arbitration procedures as follows:

. . . . .

If the dispute cannot be settled [informally] within ten (10) days, it shall be referred to an Impartial Arbitrator for settlement .... The impartial arbitrator shall have only jurisdiction and authority to determine the meaning, application of, or compliance with the provisions of this Agreement and shall not have jurisdiction or authority to add or detract from or alter in any way, such provisions.

Plaintiff's complaint, Exhibit 1, at 13.

 The plaintiff contends that this dispute requires arbitration because the NECA contract is incorporated by reference in the Scherer Agreement. The plaintiff's argument is meritless because the Scherer Agreement was executed and entered into between the parties on September 25, 1974, whereas the NECA contract was not executed until August 31, 1979. Affidavit of Morgan Bowen, filed December 24, 1984. It is settled that "an instrument may incorporate by reference only the terms of an instrument already in existence." *Bricklayers International Union,*

*Local 15 v. Stuart Plastering Co.,* 512 F.2d 1017, 1029 (5th Cir.1975).

■ The Scherer Agreement contemplates the existence of supplementary local area agreements, since these are mentioned at various points throughout.[1] The Scherer Agreement allows for subsequent modifications in the following language: "This agreement shall not be amended or supplemented except by mutual consent of parties hereto reduced to writing and duly signed by each." Plaintiff's complaint, Exhibit 1 at 26. A union and an employer may assent to modification of existing collective bargaining agreements, even without an express provision to that effect. *See Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Independent Truck Drivers Union, Local 1,* 611 F.2d 580, 584 (5th Cir.1980). In addition, "[i]t is well settled that a union and employer's adoption of a labor contract is not dependent on the reduction to writing of their intention to be bound.... Instead, what is required is conduct manifesting an intention to abide by the terms of an agreement." *NLRB v. Haberman Construction Co.,* 641 F.2d 351, 355–56 (5th Cir.1981) (citations and footnote omitted). The modification clause in the Scherer Agreement quoted above is not dispositive on the question of whether the parties might have effected a modification by some other means. An oral modification, for example, of a collective bargaining agreement may occur notwithstanding a provision requiring any modification to be in writing. *Certified Corp. v. Hawaii Teamsters and Allied Workers, Local 996,* 597 F.2d 1269, 1271 (9th Cir.1979) (citing with approval *Watson v. International Broth-*

*erhood of Teamsters,* 399 F.2d 875, 879 (5th Cir.1968)). It is arguable that Superior intended to be bound by the NECA contract. *Compare* Affidavit of Tom Garner, Exhibit A–A to Superior's brief in response to the plaintiff's motion for summary judgment, filed January 24, 1985, *with* Affidavit of Morgan Bowen, filed December 24, 1984. This question should be referred to an arbitrator.

■ Superior further contends that arbitration cannot be ordered because the contract provision on which the termination procedure is based is illegal on its face. Superior's contention is that conduct of the referral procedure in the NECA contract constitutes an unfair labor practice in violation of section 8(b)(1)(A) and (2) of the NLRA. The proper forum for this kind of question is ordinarily before the NLRB, to which the Federal court must defer as having exclusive initial jurisdiction over whether an activity constitutes an "unfair labor practice" under the NLRA. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). The federal court does not normally dispose of such issues unless the labor law questions appear as "collateral issues" in suits brought under "independent federal remedies," such as the antitrust laws. *Connell Construction Co. v. Plumbers & Steamfitters Local No. 100,* 421 U.S. 616, 626, 95 S.Ct. 1830, 1837, 44 L.Ed.2d 418 (1974). But Superior contends that the Supreme Court's opinion in *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), requires this Court to determine whether the referral procedure in the NECA contract is vio-

---

**1.** The plaintiff makes much of a letter of assent Mr. Ronald A. Lanier, Vice President of Superior, signed on Superior's behalf authorizing the "Georgia Chapter NECA as its collective bargaining representative for all matters contained in or pertaining to the current approved inside labor agreement between the Georgia Chapter NECA and Local Union 1316, IBEW." Plaintiff's supplementary brief in support of summary judgment, filed December 24, 1984, Exhibit A. Although the signature sheet on which the plaintiff relies authorizes the Georgia Chapter

NECA as collective bargaining representative, it does not reflect Superior's intent to modify the Scherer Agreement by including the terms of the NECA contract. The NECA contract states that it "shall apply to all firms who sign a letter of assent to be bound by this Agreement." Plaintiff's complaint, Exhibit 2, at 1. The letter of assent Mr. Lanier signed does not demonstrate Superior's "assent to be bound"; it merely demonstrates Superior's assent to have a representative negotiate such agreements.

lative of the NLRA without deferring to the primary jurisdiction of the NLRB.

In *Mullins,* the Court found a purchased coal-hot-cargo[2] clause in a collective bargaining agreement void and unenforceable under section 8(e) of the NLRA (and sections 1 and 2 of the Sherman Act), notwithstanding the "primary jurisdiction" of the NLRB over the question of what is or is not an unfair labor practice. The Court said that "a federal court has a duty to determine whether a contract violates federal law before enforcing it." *Id.* at 83, 102 S.Ct. at 859. The Court's holding was premised in part on the statutory mandate of the NLRA: "Section 8(e) provides not only that 'it shall be an unfair labor practice' to enter an agreement containing a hot-cargo clause, but also that 'any contract or agreement entered into heretofore or hereafter containing [a hot-cargo clause] shall be to such extent unenforcible [sic] and void.'" *Id.* at 84, 102 S.Ct. at 860 (alterations in original).

■ Superior asks the Court to apply the *Mullins* logic at some distance from its original analytical foundation. In the instant case the federal court would not be enforcing the NECA contract clause at issue, but compelling arbitration of the enforceability question.[3] The illegality defense in this case rests on whether the referral procedure constitutes an unfair labor practice. This differs from a contract clause that is unquestionably void at its inception and unenforceable by federal courts. The Supreme Court's discussion of the legislative history of section 8(e) is instructive:

2. A hot-cargo provision is a clause in a collective bargaining agreement wherein an employer agrees to stop handling the products of, or stop doing business with, another employer.

3. It is perhaps more appropriate for a court to examine this question once an arbitrator's decision has been made. Any claim that the plaintiff's suit compels illegality would be moot if the arbitrator were to rule against the union.

4. The *Robertson* court described the exclusive hiring hall arrangement in that case as establishing referral groups as follows:

It was enacted to close a loophole created by *Carpenter v. NLRB,* 357 U.S. 93 [78 S.Ct. 1011, 2 L.Ed.2d 1186] (1958) (*Sand Door*). There the Court held that the existence of a hot-cargo clause was not a defense to an unfair labor practice charge brought by a union against an employer, emphasizing that observance of the clause was not unlawful. 'Section 8(e) was designed to plug this gap in the legislation by making the "hot cargo" clause itself unlawful.'

*Id.* The contract clause in the case sub judice arguably provides a basis for an unfair labor practice charge; it is not per se unlawful by statutory fiat. This case is thus distinguishable from *Mullins:* the Court said that "[w]hile only the Board may provide affirmative remedies for unfair labor practices, a court may not enforce a contract provision which violates § 8(e)." *Id.* 455 U.S. at 86, 102 S.Ct. at 861; *see Mo-Kan Teamsters Pension Fund v. Creason,* 716 F.2d 772, 775 (10th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984). There is no clear statutory basis for a finding that the NECA contract referral provision is illegal. Superior asks the Court to accept as controlling a decision from the Tenth Circuit Court of Appeals regarding a similar contract provision. Superior relies on *Robertson v. NLRB,* 597 F.2d 1331 (10th Cir.1979), for the proposition that the IBEW referral group classifications in the NECA contract are facially illegal. In *Robertson,* the exclusive hiring hall contract provision in issue gave preference to individuals who had previously worked with employers having engaged in collective bargaining agreements with the IBEW local.[4]

In order to qualify for Group I status (first priority), an applicant is required, *inter alia,* to 'have been employed for a period of at least one (1) year in the last four (4) years under a collective bargaining agreement between the parties to this Addendum.' To qualify for Group III status (third party), an applicant is required, *inter alia,* to 'have been employed for at least six (6) months in the last three (3) years in the trade under a collective bargaining agreement between the parties to this addendum.'

597 F.2d at 1333.

*Robertson* reversed that part of a NLRB decision in which this contract provision was found not to violate section 8(b)(1)(A) and (2) of the NLRA. The *Robertson* court found that the referral provision gave preference to applicants who previously worked for employers who had collective bargaining agreements with the union. The Court also found the provision did not fall within the exception stated by section 8(f)(4) of the Act. In holding that the union and employer had engaged in an unfair labor practice, the Court of Appeals said:

> We are persuaded that the opportunity for pressures to join the union, including that exerted by an agency shop, is greater when working for a unionized employer than when working for a non union employer and that such pressures are a foreseeable consequence of the discrimination in favor of applicants who have worked for a unionized employer. We are also persuaded by the obvious inconsistency between an employee's right under section 7 of the [NLRA] ... (secured by sections 8(a)(1) and 8(b)(1)(A)) to refrain from collective bargaining and the requirement in an exclusive hiring hall contractual arrangement that he work under a collective bargaining agreement in order to secure preference in referral from the hiring hall when he is out of a job and seeking employment.

*Id.* at 1336–37.

The NECA contract referral provision provides in relevant part that Group I applicants have "four or more years' experience in the trade ... [and] have been employed for a period of at least one year in the last four years under a collective bargaining agreement between the parties to

this agreement [the NECA and Local 1316]." The contract further provides that Group III applicants have "two or more years' experience in the trade ... [and] have been employed for at least six months in the last three years in the trade under a collective bargaining agreement between the parties to this Agreement." Plaintiff's complaint, Exhibit 2, at 10. The NECA contract provision is thus directly analogous to that at issue in *Robertson*. The Court declines, however, to reach the issue decided in *Robertson*, believing that deferral to arbitration is the appropriate avenue in this context.[5] *See Carey v. General Electric Co.*, 315 F.2d 499, 512 (2d Cir. 1963), *cert. denied*, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964) ("We cannot construct a framework of legal principles governing arbitration on the theory that the arbitrator is ignorant or oblivious of the pronouncements of the Board and the Courts."); *Paramount Bag Manufacturing Co. v. Rubberized Novelty and Plastic Fabric Worker's Union, Local 98*, 353 F.Supp. 1131, 1138 (E.D.N.Y.1973).

## COUNTERCLAIM

Superior's counterclaim sets forth several claims under Georgia law that the plaintiff originally moved to dismiss for failure to state a claim and now urges is subject to its motion for summary judgment. Counts one and two of this counterclaim allege that the plaintiff has tortiously interfered with the contractual relationship between Superior and its employees and interfered with Superior's business. Count three alleges that the plaintiff's actions have violated Georgia's "right-to-work" law.[6]

---

5. The NLRB position on this issue is contrary to that stated in *Robertson*. *Interstate Electric Co. and IBEW, Local 354*, 227 N.L.R.B. 291 (1977); *Bechtel Power Corp. and IBEW, Local 322*, 229 N.L.R.B. 84 (1977), *rev'd*, *Robertson*, 597 F.2d 1331 (199). Superior has, in addition, introduced evidence which need not be considered here suggesting that the NECA contract provision was illegally applied.

6. The Court might under other circumstances decline to exercise pendent jurisdiction. In the case sub judice, however, the operative events

out of which the state claims arise occurred in 1982, and the applicable limitations period is two years. " 'That a plaintiff's state law claims will be time-barred if dismissed is certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims.' " *Henson v. Columbus Bank and Trust Co.*, 651 F.2d 320, 325 (5th Cir.1981) (Unit B) (quoting *Pharo v. Smith*, 625 F.2d 1226, 1227 (5th Cir.1980)).

## A. *The Business Torts*

 The plaintiff contends that the doctrine of labor law preemption deprives the Court of jurisdiction over the subject matter of the pendent claims and mandates summary judgment as a matter of law. The parties agree that the general test for preemption and deference to the exclusive competence of the NLRB is stated in *Garmon*, 359 U.S. at 244, 79 S.Ct. at 779: "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield."

The plaintiff argues that Superior's allegations regarding tortious interference under state law constitute unfair labor practices within the meaning of section 8 of the NLRA, 29 U.S.C.A. §§ 158(b)(1) and (2) (West 1973)[7], and are therefore preempted.

 The weight of authority is in accord with this view, holding that business torts fail to provide sufficiently substantial state concerns to overcome the doctrine of preemption, *see e.g., Mobile Mechanical Contractors Association, Inc. v. Carlough*, 664 F.2d 481 (5th Cir.1981 (Unit B), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982) (union strike to obtain trust funds prohibited by NLRA, which Act preempted state claim for tortious interference). The Supreme Court has held that under certain facts state claims for tortious interference based on union activities could be entertained notwithstanding federal concurrent jurisdiction.

> [T]he Supreme Court held that the state tort of wrongful interference with a lawful business relationship was not preempted where the picketing involved physical obstruction of a plant entrance and threats of violence. The Court carefully noted that only damages resulting from these activities could be awarded, as opposed to damages resulting from the strike and picketing themselves.

*Id.* at 489 & n. 12 (referring to *UAW v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1957)). It is plain from subsequent Supreme Court decisions that *UAW v. Russell*, which involved "mass picketing and threats of violence," 356 U.S. at 638, 78 S.Ct. at 935, sets forth a narrow exception to the general rule that such claims are preempted.[8] In this regard, the Supreme Court's analysis in *Local 926, International Union of Operating Engineers v. Jones*, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983), is applicable. That case involved a supervisor whose claim under Georgia law for tortious interference by the union with his contractual relationships was held preempted. The Court first reviewed its established preemption analysis: First, it must be determined whether the conduct alleged to be the basis of state regulation or liability is arguably within the purview of the NLRA. Second, if the disputed activity constitutes only a "peripheral concern" of the NLRA or "touches on interests deeply rooted in local feeling and responsibility," this shows that the congressional intent was not to deprive the state of authority to regulate.

---

**7.** This section reads as follows:
(b) It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein....
 (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect

to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership....
*Id.*

**8.** The same must be said of *United Construction Workers v. Laburnum Construction Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), on which the *Russell* Court relied and which Superior cites in support of its position.

Finally, if the local interest is thus deeply rooted, the court must balance potential injury to the comprehensive regulatory scheme of the NLRA and the significance of the cause of action to the state for the protection of its citizens. *Id.*, 103 S.Ct. at 1459. In short, if a state court can provide relief without interfering with federal labor policy, it is permitted to act in order to safeguard significant state concerns. *Falls Stamping and Welding Co. v. International Union, UAW*, 744 F.2d 521, 523 (6th Cir.1984) (citing *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977)).

The *Jones* Court then noted that its prior decision in *Iron Workers v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963), holding a common-law tort action for interference with an employment contract preempted, assisted the disposition of *Jones*. "Perko's discharge arguably violated the proscription of § 8(b)(1)(A) against a union interfering with the protected rights of employees and that of § 8(b)(2) against causing an employer to discriminate against an employee contrary to § 8(a)(3)." *Jones*, 103 S.Ct. at 1459.

▪ This discussion applies with equal force here. As in *Perko*, the allegedly tortious conduct falls within the regulatory ambit of the NLRA, namely, 29 U.S.C.A. §§ 158(b)(1) and (2) (West 1973). The conduct does not extend to deeply rooted local interests requiring an independent basis of protection, such as characterized, *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 301–05, 97 S.Ct. 1056, 1064–66, 51 L.Ed.2d 338 (1977) (permitting state claim for intentional infliction of emotional distress) or *Linn v. United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (permitting state claim for defamation). In these cases, the Supreme Court was careful to set limits on its stated principle:

> [W]e reiterate that concurrent state court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme.... Simply stated, it is essential

that the state tort be either unrelated to [the unfair labor practice] or a function of the particularly abusive manner in which [it] ... is accomplished....

*Farmer*, 430 U.S. at 305, 97 S.Ct. at 1066. The proper conditions are not present to permit extending the preemption doctrine exceptions to include the plaintiff's allegedly tortious conduct. That the NLRB has declined to pursue Superior's charges of unfair labor practices does not alter this fact. And although Superior asserts that punitive damages would not be available to it if the NLRB alone had jurisdiction of this case, this does not provide a basis for a contrary holding—such an argument was squarely rejected in *Garmon*, 359 U.S. at 246–47, 79 S.Ct. at 780. Accordingly, the Court holds that Superior's claims of tortious interference are preempted under the NLRA, and that summary judgment on this issue must be granted for the plaintiff as a matter of law.

B. *Georgia's Right-to-Work Law*

▪ In general, a state right-to-work law may be enforced: section 14(b) of the NLRA, 29 U.S.C.A. § 164(b) (West 1978), provides that "[n]othing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any state or territory in which such execution or application is prohibited by state or territorial law." Pendent jurisdiction cannot be expanded to include activities not governed by a contract between the parties however, because the authority conferred under section 164(b) to the states to forbid the execution or application of agreements requiring membership in a labor organization "begins only with actual negotiation and execution" of such agreements. *Retail Clerks International Association Local 1625 v. Schermerhorn*, 375 U.S. 96, 105, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963). "Absent such an agreement," and the record shows none in existence, "conduct arguably an unfair labor practice would be a matter for the National Labor Relations Board under *Garmon*." *Id.* In consequence, the Court

holds that Superior's claim based on violation of Georgia's right-to-work laws is preempted by the NLRA; summary judgment on this issue must be granted to the plaintiff as a matter of law.

## REMAINING MOTIONS

### A. *Motion to Amend Reply to Counterclaim*

(1) The plaintiff's amendment sets forth a defense that the defendant's counterclaim is barred by the applicable statute of limitations. Because of the Court's disposition of Superior's counterclaim, the plaintiff's motion to amend is moot.

### B. *Motion to Amend Complaint*

The plaintiff moves for leave to amend its complaint to include the following amendment to its prayer for relief: "6. Back pay, compensatory damages, and exemplary damages under the authority of the court or the arbitrator." Superior argues that if arbitration is ordered, the merits of the dispute and thus the question of what damages are to be awarded are questions solely for the arbitrator to decide. The court's inquiry in this context is limited to whether arbitration should be ordered. The motion to amend is therefore denied.

### C. *Motion to Amend Counterclaim*

■ Superior seeks to amend its counterclaim pursuant to Rules 13(f) and 15(a) to add a claim that the plaintiff has violated section 301 of the NLRA and the terms of the collective bargaining agreement by attempting to discriminate against employees who are not members of the plaintiff union. Superior observes that no further discovery will be occasioned by this amendment. Leave for such amendments is to be freely given under the Rules, and the plaintiff has not opposed this motion or indicated that it would be prejudiced by it. Superior's motion to amend its counterclaim is granted.

### D. *Motion to Compel*

The plaintiff's motion to compel discovery is moot.

In sum, the Court GRANTS the plaintiff's motion for summary judgment on the issue of arbitration and with respect to Superior's state law claims. In addition, the plaintiff's motion to amend its reply to Superior's counterclaim is MOOT, the plaintiff's motion to compel production of documents is MOOT, the Court GRANTS Superior's motion to amend its counterclaim and GRANTS Superior's unopposed motion to include its trial brief in the pretrial order.